IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JEFFREY SCECINA, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Case No. 19-416 |
| | § | |
| SEACLIFF SEAFOODS, INC. dba PACIFIC | § | |
| SEAFOOD TEXAS, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF JEFFREY SCECINA'S ORIGINAL COMPLAINT AND JURY DEMAND**

## Introduction

This is an action for disability discrimination under the Americans with Disabilities Act as amended.  Plaintiff Jeffrey Scecina was formerly employed by Defendant Seacliff Seafoods, Inc. dba Pacific Seafood Texas as an outside food service sales representative.  After Plaintiff was diagnosed with Avascular Necrosis, a condition that rendered Plaintiff substantially limited in one or more major life activities, Defendant almost immediately discharged Plaintiff from employment, advising Plaintiff that his medical condition could not be accommodated.  In fact, Plaintiff could have performed the essential functions of his existing job with minimal reasonable accommodation.  Alternatively, Defendant could have transferred Plaintiff to an existing vacant inside sales position for which he was also qualified.

## Parties

1.     Plaintiff Jeffrey Scecina is an individual residing in San Antonio, Texas.  He may be served with papers in this case through the undersigned counsel.

2.      Defendant Seacliff Seafoods, Inc. dba Pacific Seafood Texas is a foreign for-profit corporation organized under the laws of the State of California.  It maintains its principal place of business at 16797 SE 130th Ave., Clackamas, OR 97015.  It may be served with process through its registered agent, National Registered Agents, Inc., at 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136.

### Jurisdiction and Venue

3.      The Court possesses personal jurisdiction over Defendant because Defendant maintains offices in the State of Texas and constantly conducts business in Texas.  The Court possesses subject-matter jurisdiction over this case because Plaintiff sues under a federal statute, the Americans with Disabilities Act as amended.  Venue is proper in the Western District of Texas because all of the events giving rise to Plaintiff's claims occurred within the San Antonio Division of the Western District of Texas.

### Statement of Facts

4.      Plaintiff commenced work for Defendant on August 7, 2017.  Plaintiff was hired as an Outside Foodservice Sales Representative.  During his training period with Defendant, around a week or two after he was hired, Plaintiff started to have some pain in his right hip.  He did not think anything of it at the time.  He assumed the soreness was part of getting older.  Despite this, Plaintiff was still capable of doing his job.

5.      Plaintiff finally decided to go to see his primary care doctor (Dr. Shahbaz Yazdani) on Tuesday October 17 as the discomfort was still there.  Dr. Yazdani advised Plaintiff to get an MRI, thinking that Plaintiff may have fractured his hip.  Dr. Yazdani provided Plaintiff with a doctor's note that stated, "Patient is to work from home until MRI is done."  Plaintiff

emailed this doctor's note to his employer that same day. Plaintiff's insurance had not kicked in yet, so Plaintiff had to pay for this appointment out-of-pocket.

6.     With permission from human resources, Plaintiff made an appointment to have my MRI done that same day (October 17). The MRI revealed that Plaintiff was suffering from Avascular Necrosis (AVN) in his right hip. AVN is a chronic condition that results in the death of bone tissue due to a lack of blood supply.

7.     Plaintiff worked from home from October 17-19 at the advice of his doctor, then returned to work on Friday, October 20, 2017. On that same day, Plaintiff met with Katie Larcom (Sales Manager) and Reggie La Guardia (General Manager), and provided them with a doctor's note from Dr. Yazdani.

8.   Plaintiff reassured them that he could still do everything that he had been doing up to that point, and that his AVN diagnosis would not interfere with the ability to do his job. In fact, Plaintiff had just traveled to the Rio Grande Valley, Austin, and New Braunfels for work. La Guardia made a comment that he did not think Plaintiff was capable of doing his job as an Outside Sales rep (due to the diagnosis), but again, Plaintiff reassured La Guardia and Larcom that he could still do his job. When Larcom noted that Plaintiff had previously expressed concerns about possibly needing an inside sales job, Plaintiff stated that this would all depend on what the orthopaedist, who he had not yet seen, decided. Plaintiff stated that if the orthopaedist tells him that he needed to do a desk job, then he might need a lateral move. But Plaintiff explained that, as of now, nothing had changed in his ability to do his job. Plaintiff made it clear that he was invested in this Company. Sensing that La Guardia and Larcom wanted him out of his position, even stated he was willing to move laterally at a lower salary if that is what they wanted.

9.      Margo Trejo (HR) provided Plaintiff with an accommodation form.  Plaintiff told Margo that it was not needed, as he was not requesting any kind of accommodation and did not in fact need one at the time.  Ms. Trejo then told Plaintiff that the accommodation form was "not necessary."   However, Larcom told Plaintiff that he would not be able to continue working without completing the accommodation form.  Plaintiff took the form to his doctor that same day.

10.     Plaintiff picked up the completed form from his doctor on Monday, October 23, then provided it to his employer that same day.  The only restrictions from Dr. Yazdani were that he did not recommend prolong standing and/or prolong sitting without the use of an aid such as a prosthetic device until further notice.  These restrictions did not keep Plaintiff from doing his job.

11.     On the same day, October 23, Larcom asked if Plaintiff would like to move his office downstairs so that he would not be required to use the stairs (since there was no elevator). Plaintiff appreciated the gesture, but did not believe it was essential. When Larcom kept insisting, Plaintiff told her that he would move offices if it would make everyone else feel comfortable.

12.     Unbeknownst to Plaintiff at the time, the emails submitted by Defendant with its statement of position to the EEOC support this conclusion.  In the October 23, 2017 email exchange between management and HR Specialist Adam Ryding, Margo Trejo forwarded Plaintiff's work restrictions from his physician (no prolonged sitting and no prolonged standing). Ryding then responded that "[a]commodations is up to Reggie/Katie" and states that "his notes are vague enough that we'll need to have a conversation with him of what he's capable of and not capable of in his role."  Larcom then responded that she has asked Plaintiff to put together a

plan of action "on what an immobile sales rep would look like and what he assumes his responsibilities entail and I have yet to see that. That would be a determining factor for me." Ryding then replied that "[b]ased on the paperwork the doctor filled out and my understanding of the role, I would think he would be able to do his job without much accommodation. But—the key word here I guess would be what is 'prolonged' means in terms of sitting and standing." Significantly, Ryding also stated, incorrectly as a matter of law, that "[w]e do not have to make any accommodation if he's not able to perform his duties."

13.     On Tuesday, October 24, Plaintiff had—what he thought was—a positive conversation with Katie about his future with the Company. Plaintiff once again expressed his investment in the Company and how happy he was to be there. Plaintiff reiterated that he planned on continuing working in outside sales, but stated that if the orthopaedist told him he could not do so, then he would like to work in inside sales at lesser pay. Plaintiff understood that an inside sales position had recently become vacant and available. Larcom stated that she had already interviewed candidates. Plaintiff noted that he was already trained, and that if placed in the position, he would be willing to train a new outside sales representative.

14.     On Wednesday, October 25, Plaintiff arrived at work at approximately 8:45am. He was called in to meet with Larcom and Randy LNU (Operations Manager) between 10:30-10:45am. Sadly, instead of waiting for Plaintiff to see the orthopaedist as directed by Plaintiff's primary care physician so that Plaintiff could get a true assessment of his condition and limitations (if any), Defendant rushed to terminate Plaintiff from employment. Plaintiff was provided with a letter of termination: "During your introductory period, we have attempted to work with you regarding your personal injury, by engaging with you to find a reasonable accommodation that works for you and the business. Unfortunately we are not able to make an

accommodation, as your restrictions do not meet the business needs for your role as an Outside Foodservice Sales Representative." This, of course, was patently false.

15.     Had Defendant fully engaged in the interactive process, as it was required to under the law, it would have determined that Plaintiff could have continued doing his job, or in the alternative, reassigned him to the vacant Customer Service position or other vacant position (that was never offered).  In fact, as fate would have it, Plaintiff was able to see an orthopaedic specialist just a few days after his termination from employment, and the orthopaedist encouraged Plaintiff to take regular exercise, ride a bike, and walk extensively.  Other than refraining from high impact activities and activities such as climbing ladders where there was a significant fall risk, Plaintiff was given no activity restrictions.  So Plaintiff could have continued to work as an outside sales representative.  Since his termination, Plaintiff has maintained a very active lifestyle.

### Cause of Action:  Disability Discrimination in Violation of the Americans With Disabilities Act as amended

16.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 18 supra.

17.     Defendant is an employer within the meaning of the ADA as amended in that it has, for each year relevant to this lawsuit, employed more than 15 employees in 20 or more calendar weeks.  Likewise, Plaintiff was an employee of Defendant within the meaning of the ADA.

18.     Defendant was an employer within the meaning of the ADA as amended in that it in 2016, 2017, and 2018, it employed well in excess of fifteen employees in more than twenty calendar weeks.  Plaintiff was an employee of Defendant in that he had an employment relationship with Defendant and was actively employed by Defendant in San Antonio over several months in 2017.

19.     While employed by Defendant, Plaintiff was diagnosed by his primary care physician with avascular necrosis in his right hip, a medical condition that substantially limited him in major life activities within the meaning of the ADA as amended.  Plaintiff informed his managers of his condition.  Plaintiff was provided with a reasonable accommodation form and was instructed to have it filled out by his physician before he could be allowed to return to work. Plaintiff therefore took the form to his primary care doctor for completion, and Plaintiff returned it just a few days later.  The only restriction that the physician placed on Plaintiff was no prolonged sitting and no prolonged standing without the use of a prosthetic device pending consultation with an orthopaedist.

20.     Before allowing Plaintiff to consult with an orthopaedist as directed by the primary care physician, Defendant rushed to terminate Plaintiff's employment, firing him just a few days later without exploring reasonable accommodation any further or whether Plaintiff might be able to perform his job duties without reasonable accommodation.

21.      Defendant claimed that it could not reasonably accommodate Plaintiff's medical condition, when in fact, it had not even tried to do so.  Shortly following his termination, Plaintiff was able to be seen by an orthopaedic surgeon who recommended regular and vigorous exercise to Plaintiff and cleared Plaintiff to work without any significant restrictions.  The irony is that, had Defendant not rushed to fire Plaintiff as it did, Defendant would have learned that Plaintiff's temporary restrictions would be lifted and that Plaintiff was cleared to work without restrictions.

22.     Plaintiff pleads that he was fired because of his disability, or in the alternative, because Defendant regarded him as disabled.  Plaintiff further pleads that even assuming arguendo that his disability prohibited from performing the essential functions of his job, he

could have been, and should have been, transferred to an inside sales position as a reasonable accommodation.

23.     As a result of his termination from employment, Plaintiff has suffered lost wages and benefits, emotional distress, mental anguish, humiliation, and even damage to his reputation. Plaintiff sues for these damages.  Additionally, because Defendant acted with malice or at least with reckless disregard towards Plaintiff's legally-protected rights, Plaintiff is entitled to an award of punitive damages.  Lastly, because Plaintiff has had to retain counsel to vindicate his rights through this lawsuit, Plaintiff is entitled to an award of attorney fees.

**Administrative Prerequisites Satisfied**

24.     On December 21, 2017, Plaintiff timely dual-filed a charge of disability discrimination with the U.S. Equal Employment Opportunity Commission and the Texas Workforce Commission—Civil Rights Division.  Plaintiff received a Right to Sue letter on January 31, 2019.  Plaintiff now files this lawsuit within 90 days of his receipt of his Right to Sue letter.

**Jury Demand**

25.     Plaintiff demands a trial by jury.

**Conclusion and Prayer**

26.     Plaintiff prays that, upon final judgment, he be awarded the following:

(a)     Lost wages and benefits in the past and the future;

(b)     Compensatory damages for emotional distress, mental anguish, humiliation, embarrassment, damage to reputation, and loss of enjoyment of life;

(c)     Punitive damages;

(d)     Attorney Fees;

(e)     Costs of court; and

(f)     All other relief to which he is entitled.

Respectfully submitted,


/s/ Michael V. Galo, Jr.
Michael V. Galo, Jr.
State Bar No. 00790734
GALO LAW FIRM, P.C.
4230 Gardendale, Bldg. 401
San Antonio, Texas  78229
Telephone -- 210.616.9800
Facsimile -- 210.616.9898
Email: mgalo@galolaw.com
ATTORNEYS FOR PLAINTIFF
JEFFREY SCECINA